

# NUMBER 13-25-00007-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE INTEREST OF S.A.H., A MINOR CHILD

---

### ON APPEAL FROM THE 430TH DISTRICT COURT
### OF HIDALGO COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Chief Justice Tijerina**

Appellants R.H. (Father), and V.A.A. (Mother) appeal the trial court's termination of their parental rights to their minor child, Linda.[1] By five issues, Mother challenges the statutory termination grounds and contends that it was not in the child's best interest to terminate her parental rights. Father's court-appointed appellate attorney has filed an *Anders* brief stating that there are no arguable issues. *See Anders v. California*, 386 U.S.

---

[1] We refer to the parties and the child by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

738, 744 (1967). We affirm.

## I. BACKGROUND

On April 4, 2021, the Department of Family and Protective Services (the Department) filed an original petition for termination of Mother's and Father's parental rights, and it attached an affidavit from its investigator. In the affidavit, the Department alleged that Linda, who was five years old, lived with her maternal great aunt Angie who had been appointed Linda's permanent managing conservator in 2017; however, Angie sent the Department a letter requesting that Linda be placed in a foster home because she could no longer care for Linda due to Linda's behavioral issues.[2] The trial court appointed the Department as Linda's temporary managing conservator and the parents as temporary possessory conservators "with limited rights and duties." Trial took place before an associate judge at four separate settings in 2022 and 2023.

### A. May 2022 Testimony

#### 1. Mother

At the first trial setting on May 3, 2022, Mother testified that she has four children: six-year-old Linda, three-year-old Mathew, one-year-old John, and Tony; Mathew and

---

[2] The trial court took judicial notice of the court's file in this case. In the affidavit attached to the petition for parental termination, the Department documented that Linda had been removed from Mother's custody because Mother "was using [s]ynthetic [m]arijuana" and Mother and Father had a "history of domestic violence when they were in a relationship." The affidavit details the parents' history with the Department. It further alleges that Mother stated Father hits her and "smokes the Synthetic Marijuana." Father denied both allegations. The affidavit stated that the trial court ordered Linda removed on June 23, 2016, and, in 2018, Mother admitted that she "smoked throughout her pregnancy with" Tony, another child. According to the affidavit, Mother was arrested for possession of marijuana in 2018; "mentioned that she was trying to sell the drugs in order to make ends meet"; and "admitted to having used synthetic marijuana on a daily [basis] and Xanax bars during the time that she was the only caregiver to her son [Tony who was] a very young child."

2

John live with Mother while Tony is in foster care like Linda.[3] Mother testified that when Linda was first removed from her custody, they lived "at the Salvation Army" in McAllen, Texas. Mother stated that Linda is in foster care "[b]ecause I didn't have her in a good home. And because when they drug tested me there at the Salvation, they said that I had come out dirty for something. I don't remember what it was but I don't even do those drugs." Mother did not recall when Linda was removed but thought she "was . . . about nine months" old.[4] Mother said Linda was then placed in Angie's custody for "more than four years."

Mother testified that when Linda was removed from Angie's custody in February 2022, Mother lived in Kerrville, Texas with her father, Mathew, and John. Mother stated that, approximately four months prior to her testimony, she had moved to the Rodeway Inn in San Juan, Texas. Mother testified that she works at Dairy Queen. According to Mother, the Department asked her to perform certain "services" for her case including attending parenting classes, domestic violence classes, and a drug and alcohol assessment, which she did not complete because she moved to San Juan. Mother said, "I did some of my services [in Kerrville]" and claimed she needed two more parenting classes and domestic violence classes. Mother stated that she submitted to a drug and alcohol assessment. Mother claimed that she recently submitted to a hair follicle drug test, which was negative.

The Department asked if Mother had been ordered to attend visitation with Linda.

---

[3] Tony's age was not revealed.

[4] At the next trial date of August 5, 2022, Mother clarified that Linda was removed and began living with Angie in 2016 when she was two years old, and Angie was appointed Linda's permanent managing conservator in 2017.

Mother responded, "It just recently stopped probably like about a month and a half ago . . . because I am just hurting her more." Mother explained that Linda "is just getting confused . . . [and] acting up at her foster home because she wants to come home." Mother stated, "She did ask me that how come she couldn't come home if I have her brothers with me. Sometimes I don't know how to answer her question." The associate judge concluded the proceeding and continued the trial to another date.

## B. August 5, 2022 Testimony

### 1. Mother

The trial resumed on August 5, 2022. Mother testified that she now resided at America's Best Value Inn in Pharr, Texas, and had lived in Pharr "[f]or a month already." Mother testified that her parental rights to Tony had been terminated because "I stopped seeing [Tony] . . . and I never heard of him; I never bothered again."

Mother stated that she used drugs such as synthetic marijuana in the past but has "been sober for 3 or 4 years already." Mother admitted that she had been attending "substance abuse services" but stopped "going because . . . [she had been] using [her] sister's car and her tags were expired." Mother claimed that her effort to get a ride with the Department had been unsuccessful. On cross-examination, when Linda's attorney ad litem asked how many drug abuse classes she lacked, Mother said, "I'm not sure."

Mother testified she was pregnant with her fifth child at the time of the trial and was due to have her baby in September or October 2022. Mother explained that her mother took care of the children when she gave birth.

Regarding her plans for Linda's medical care, Mother stated the following:

I have Doctor Juan Aguilera, it's the same pediatrician that the boys go to.

4

[M]y case worker was telling me that she does have mental health issues and stuff like that. Anything with rides like that, I do have Medicaid, all of my kids have Medicaid, so when it comes to doctor's appointments or anything of therapy [sic], I do have a ride to attend all of those sessions because of Medicaid. Medicaid provides rides.

The Department asked Mother to explain how she planned to "deal with [Linda's] behavioral issues." Mother responded, "[I]n order for me to deal with her issues, I need to have her under my care to see how she reacts . . . . I just feel like maybe she's just acting out because she wants to go home." On cross-examination by her trial counsel, Mother testified that Linda has mental health issues and that she is willing to "follow up with any recommendations for a psychiatrist or therapy that she may need."

Mother testified that Linda was not with her "[b]ecause I never fought for her. She was with [Angie,] . . . so I would go see her, I would go and visit and we would go out to eat and stuff like that." Mother said, "The longest I've gone without seeing her is like months, like four or five months," and "[i]t's been like five months already or six months, the last time that I video chatted with her." Mother stated, "I've been trying to get in touch with her, I've been trying to call . . . video chat with her again but [the Department's caseworker] said that the Judge said that I couldn't talk to her." Mother claimed that the last time she contacted the caseworker, the caseworker "never replied" to her questions about Linda. Mother testified that on a previous occasion when the caseworker texted that she was outside her hotel, Mother "told [her] I just got out of the doctor's office. But she never called or texted back."

On cross-examination by Linda's attorney ad litem, Mother testified that she did not know why she could not speak with Linda. Linda's attorney ad litem asked, "[W]as it because you failed to make the visits?" Mother replied that she had been attending visits

5

via Zoom. Linda's attorney ad litem said, "I understand that, but did you make all your visits or sometimes you didn't call when you were supposed to? Is that one of the reasons why?" Mother responded, "It was just once or twice that that happened but . . . I did call the lady and I did let her know ahead of time." Linda's attorney ad litem asked Mother if she had written "any letters [to Linda] during this period, like for the holidays or June 8[, her] birthday?" Mother said, "I have them with me. I do but I just keep them."

On cross-examination, Mother agreed with her trial counsel that although they attempted to get the records of certain classes she had taken in Kerrville, they were unable to do so. Mother testified that she is ready and financially able to care for Linda with her sons, and stated, "I've been waiting for this." Mother said she receives food stamps and WIC, and after her baby's birth, she plans on either going "back to [her] security job" or working at Dairy Queen. Mother's trial counsel asked, "So what is it . . . that you're asking of the Court today?" Mother replied, "I'm asking for an opportunity to bring [Linda] home with me and to give me a chance to be a mom to her. . . . I've come a long way; I've changed a lot. I wouldn't have these kids in my care; I wouldn't be risking them. I want them all under one roof."

On re-direct examination by the Department, Mother stated that although she is not in a relationship with her unborn child's father, he "helps [her] with money" if she asks. Mother denied that there had been domestic violence in her home. Mother testified that she did not own a car due to being involved in an accident. Mother admitted that she was arrested when the accident occurred sometime "last . . . October . . . [b]ut only because [she] . . . left and then [she] came back . . . because [she] was scared."

Mother acknowledged that sometimes if an emergency arises, she leaves her

6

children with her mother, who has history with the Department. The Department asked, "[D]o you think that it's a good idea to leave your kids with your mom?" Mother replied, "My mom, she's good . . . right now" and was only caring for one of her sons. Mother stated she would not leave Linda with her mom because she "doesn't really know" her.

### 2. Vasquez

Patricia Vasquez, a Department caseworker, testified that she had been assigned Linda's case "[t]o set up the family with services, to visit the family, visit the child, make sure the family was safe" after Angie notified the Department that she refused to accept parental responsibility. Vasquez stated that the Department had considered Father's girlfriend at the time as an option for placing Linda. Vasquez said, "We did do a complete home assessment for her, but unfortunately it was a negative assessment." According to Vasquez, an assessment of Mother's father's home also received negative assessments because "there was criminal history in the house and then [Mother] ended up moving down here to the valley." Vasquez said, "So she left that area and came . . . back down here. So . . . I was unable to locate her," and Mother "was inconsistent with her contact . . . she changed her number at least three times. She would use her dad's phone when she was in Ingram[, Texas,] and it was difficult to get a hold of her. And then at one point her phone would only work off of WiFi."

Vasquez stated that Mother "was sporadic with her visits" with Linda and "only attended 12 of those 42" visits. On cross-examination by Linda's attorney ad litem, Vasquez stated: "[T]here was [sic] also issues with [Mother] promising [Linda] things like, you're coming home with me, I've got this Christmas gift for you, and then there would be behaviors after that the foster parents were having to deal with."

7

Vasquez said that Mother told her "that she didn't have any drug issues" but "[s]he had issues with using synthetic marijuana as well as marijuana as well as Xanax bars." On cross-examination by Mother's trial counsel, Vasquez stated that Mother "didn't comply with the hair follicle test," and "there was a concern that she was using synthetics and avoiding drug tests." Vasquez acknowledged that Mother took a hair follicle drug test in April 2022, but emphasized, "it was ordered May of 2021." Vasquez approved some drug counseling services to be virtual, which Mother did not attend. On cross-examination by Mother's trial counsel, Vasquez said, "I know in the beginning, she was attending when we first . . . referred her . . . but then she stopped going for whatever the reason was."

Vasquez testified that the Department "has concerns that [Mother] is not able to meet [Linda's] . . . basic needs as well as her mental health needs." Vasquez explained, "[Mother] hasn't addressed her own mental health needs, whether it's attending an appointment, whether it's virtual or in person[;] so the [D]epartment's concerned that she's not going to follow through with [Linda's] appointment and the[re a]re many."

On cross-examination, Linda's attorney ad litem asked Vasquez to explain Linda's "impairments." Vasquez responded as follows:

> She's actually had . . . a recent psychological that we don't have the results yet because she just got it done but on the last one that was from 06/2021, she has an adjustment disorder. And then she had a previous psychological with Pina and Associates . . . maybe that February that same year that says she has Oppositional Defiance Disorder [(ODD)], ADD, which is Attention Deficit Disorder, as well as explosive mood disorder.

Vasquez said "she's a healthy child" who is going to be in second grade. Vasquez testified that Linda has "attachment disorder" and exhibited "signs of neglect." On re-direct examination, Vasquez said that Linda "requires a lot of one-on-one." Vasquez continued:

8

Right now what the issue is . . . [Linda] doesn't like to be told no, so they told her no and she scratched foster mom, she kicked foster mom, she took all her belongings and threw it all over the floor, I mean, she had a meltdown. So foster mom kind of like gave her her space[;] so you have to know how to handle [Linda]. But yes, she requires a lot of one-on-one attention.

The Department asked, "Why was the [D]epartment not in agreement to place the child back with . . . [Mother]?" Vasquez replied:

There are concerns regarding [Mother's] stability with home, employment. [Linda] needs a structured environment and I don't think [Mother is] able to provide that for her. [Linda] requires therapy appointments, regular appointments, that she would need to attend, whether it's medication review, psychological, psychiatries, as well as individual counseling to help her with her behaviors, and I think there's an issue with that. There's also the fact . . . I haven't been able to observe [Mother's] home, where she lives, what the environment is, as well as her current boyfriend.

Vasquez explained that she has been unable to observe Mother's home environment. Vasquez stated:

I know that she stayed in one hotel, the Ro[de]way Inn. The one time that I did go out there was another gentleman but she was always switching rooms and it would be a difficult time trying to get her room number. And then she moved to America's Best and the one time that I did go out there, which was on the 14th of July I did wait out there for about an hour before [Mother] finally messaged me back that she wasn't there.

Vasquez testified that Linda is currently in a foster home in Houston, Texas, and "is adjusting to the home and . . . she does ask every now and then for the previous foster mom. Every now and then she will as[k] for her *Tia*." Vasquez stated that Linda told her she missed her previous foster mother in Laredo, Texas. Linda had not asked for Mother.

### 3.    Loredo

Maria Angela Loredo, Linda's guardian ad litem, testified that she first met Linda approximately in June 2021. Loredo agreed that Linda has mental impairments, needs

9

medication, structure, and to be taken to the doctor on a regular basis. Loredo explained that Linda had lived with Angie for five years, for one year in a foster home in Laredo, and currently resided in a foster home in Houston.

Loredo believed that Linda, who was seven years old at the time of her testimony, was "doing good" and "adjusting" in her placement with her foster parents. The Department asked, "And she never really mentions her mom?" Loredo replied, "No. She would mention her prior [to] this year before when she would get the calls. But other than that from . . . the beginning of this year [un]til now she hasn't." Loredo explained that Linda "misses her previous foster placement so she has expressed that she misses them." However, "she's never said that she doesn't like it there or that she doesn't, you know, enjoy it there." The Department asked, "Does she ever express how she misses her mom or misses her dad?" Loredo said, "No. Sometimes when she says [']mom['] it could either be [Angie or her foster mother] so she tends to say like [']mom['] but she means [Angie]" or her previous foster mother.

Loredo did not feel that it would be appropriate to place Linda with Mother because Loredo did not "know how the relationship between them is," and she had not "seen them interact at all" because she "tried to contact [Mother] several times but there hasn't been that communication." Loredo believed that termination of both parents' parental rights was in Linda's best interest. Loredo explained:

> [Linda] needs structure and I think that's what she has right now, structure. She needs to take her medication at certain times, they have to monitor [her medication.] I mean they just changed her taking her pill at 2 o'clock because if she doesn't take it at that time then she has a meltdown. So she needs structure, she needs therapy[;] she needs a steady [home environment, and] that's something I have not seen with [Mother].

10

Loredo recommended adoption for Linda. Mother's trial counsel asked if her opinion would change if she could observe a positive visit. Loredo replied, "I just feel that I tried for so many months to contact her and I don't see the willingness to speak to me or to discuss, you know, what can we do or how can we work towards bettering the situation for her." Loredo hypothesized that if Linda were returned to Mother, "it would impact her . . . because . . . she's been going through so many changes."

According to Loredo, Linda wishes to be placed with Angie or her previous foster mother. Loredo said, "I think it's the people she's been with and that she has a relationship with." When asked if she would like for Linda to be given the opportunity to be with Mother, Loredo responded, "I've tried, I mean, I want what is best for [Linda]. I've tried to communicate many times with [Mother] by phone, email, text messages, for the past . . . every month I want to say since I started the case but I haven't seen anything back." Loredo reiterated that she "tried to reach out to [Mother] many times and there hasn't been any calls, or messages, or . . . there hasn't been anything."

## C. August 10, 2022 Testimony

### 1. Vasquez

After a continuance, trial recommenced on August 10, 2022. Vasquez testified that she recently observed Linda's visit with Mother as they "did a face-to-face visit for about three hours at the [D]epartment." Vasquez stated, "Mom was attentive to [Linda]. She was paying attention to her, she'd engage her. They took pictures. . . [and] Linda met her little brother as well." Vasquez believed that Linda enjoyed the visit. Vasquez gave Linda a letter from Father "that he had presented [to] the Court. She liked that so, [they] talk[ed] about that, [and] Linda mentioned dad as well." Linda stated that she misses Mother.

11

Linda told Vasquez "that she wanted to see [Father] but she didn't want to live with [Father]; she wanted to live with [Mother]." Vasquez described the visit as follows: "It's typical parenting problems. I think [Mother] would benefit from parenting classes and I know given that she's going to have another little one. There's going to be some issues . . . there . . . [that] would be addressed with parenting [classes]." When asked if she saw any concerns with the visit, Vasquez replied, "Given it was her first visit, it went well." There were no issues after the visit other than Linda cried when they left the visit "because she wanted to stay with [Mother]." Vasquez said that Linda "misses" Mother.

### 2. Loredo

Loredo testified that after observing Mother's visit with Linda, she believed Linda and Mother shared a bond, the visit had been a positive and "good interaction," and Mother could benefit from parenting classes. According to Loredo, Linda's preference of where to live "changes a lot" depending on who Linda last visits. When asked if she believed that, given another chance, Mother could take care of Linda with her other children, Loredo responded, "I think that in order for her to do that she would need to complete her services . . . I would need to see more." Father's trial counsel asked, "So at this point in time are you telling this Court that [Mother] . . . deserves a second chance?" Loredo replied, "If she is engaged, yes." Loredo testified that at this time she is "[a]gainst termination, [and favors] to continue working . . . with [Mother]."

The associate judge determined that it would consider allowing parental visitation with Linda after guidance from Linda's therapist. The judge further stated that Mother should attend the parenting classes that it ordered as part of her service plan. The judge postponed deciding whether to grant parental visitations, set a hearing date for that ruling

12

for October 12, 2022, and recessed the cause until then.

## D.    November 2022 Testimony

On October 12, 2022, the associate judge reset the case for November 4, 2022. The judge asked if visitation had continued, and Vasquez stated visitation is "twice a month for four hours at mom's place." On November 4, 2022, Mother's trial counsel requested a hair follicle test, which the trial court granted. The associate judge reset the trial for November 30, 2022.

### 1.    Skalitsky

Patricia Skalitsky, Mother's former therapist, testified that she saw Mother one time for one session and then had to close the case in May 2022 "due to noncompliance of counseling services." Skalitsky stated, "We received a new referral in . . . August of 2022 . . . of which [Mother] completed . . . five sessions but most recently she was closed again due to noncompliance of services." According to Skalitsky, a case is closed "after the third absence or the third missed session, at our agency," and Skalitsky "actually gave [Mother] another opportunity of which was unsuccessful. So she was closed in October." The Department had asked Skalitsky the purpose for Mother's therapy. Skalitsky said, "I believe [the Department] had asked of the therapist to work on educating her in the subject of domestic violence, how to prevent domestic violence for herself, how the domestic violence affects her children, the protection of her children, the abuse . . . and neglect of her children." Mother also had a substance abuse therapist.

Skalitsky believed that Mother had been "making progress. She was working and at that time . . . she was living in a hotel and so she was working for the hotel, in order to pay for her room and to be able to provide for her children, which shows responsibility

13

honestly." Skalitsky said, "She had done really well in attending her sessions for like a month and a half straight and then she had that last no-show session and I ended up having to discharge her." Skalitsky testified that Mother was very eager to regain custody of Linda and made progress because "[s]he was maintaining her sobriety," was earning an income, and "she had secured some placement for her children in a daycare facility, so that she could maybe work more hours."

### 2. Vasquez

Vasquez testified that on November 18, 2022, she visited Mother who was then staying with her sister, D.A.; however, Vasquez was unable to complete a home assessment because Mother and D.A. had "a bit of a falling out and so [they] ended it because [they] weren't going to get any further in the assessment." Vasquez stated, "[W]hile I was there, I was able to view most of the home, except two of the rooms in the home. [Mother] had stated that . . . one of the rooms was her . . . sister's bedroom" and the other room was the sister's work area. According to Vasquez, at the time of her testimony, Mother had an "open investigation regarding those three children, so currently her sister . . . has 24/7 supervision with the kids." Vasquez stated, "So [Mother] instead of living at the hotel, going back and forth, her and her sister came to an agreement saying it would be better for her to live with her sister" so that "she's able to be with her children, as well as try and save money for a home or an apartment." The Department asked if any new services had been offered to Mother. Vasquez replied, "Yes. With . . . her drug classes she was actually unsuccessfully discharged. So, I gave her another referral," and although Mother made an appointment with that program, she "missed her appointment." Mother's hair follicle test had been negative. Mother's last urine test for synthetic

marijuana was negative too. Vasquez stated that Mother had tested positive for synthetic marijuana in the beginning of the case when she still lived in Kerrville and that Mother has "tested positive for alcohol recently."

Mother's trial counsel then requested a recess and asked the "Court to consider allowing [Mother] to have weekend visits with [Linda] at [D.A.'s] home. At least during the holiday and then perhaps . . . [the court] could come back to increase those visits." The Department had "concerns only because of the current open investigation." Linda's attorney ad litem agreed that it was in Linda's best interest to spend time with Mother. The associate judge "order[ed overnight] visits" twice per month "weekend visits Fridays 6:00 to Sunday 6:00."[5] Linda was returned to Mother's custody in December 2022.[6]

## E.    June 2023 Testimony

The trial commenced once more on March 8, 2023, wherein the Department offered the testimony of Leslie Velazquez and Sophia Angeles. Mother's and Father's trial counsel objected, and the associate judge granted the objection and recessed the cause and "passed the case for 30 days." The judge reset the cause for April 19, 2023. On April 19, 2023, Mother's trial counsel requested a continuance because Mother had been arrested "by McAllen P.D." that morning. Trial was reset for June 2, 2023.[7]

---

[5] On December 20, 2022, the trial court signed an order allowing Mother visitation with Linda twice a month on the first and fourth weekends of the month from Friday 6:00 p.m. to Sunday 6:00 p.m.

[6] On January 9, 2023, Mother filed a motion for a special hearing to address placement of Linda with her.

[7] Father had previously been excused from participating from further proceedings per his trial counsel's request that the trial court granted.

15

### 1. Angeles

Angeles, a Department investigator, testified that on February 16, 2023, she "went to [D.A.'s] house and . . . did an investigation." Angeles stated that "[b]asically, [the Department received allegations] that [Mother] was unstable and there were concerns for drug use and her mental health." Angeles said, "I went to go let [Mother] know there was an open [Department] investigation involving her kids. She allowed me to enter her home. I did observe her . . . pacing back and forth and she had paranoid behavior and our conversation was short." Angeles elaborated, "[Mother] told me she hadn't slept . . . in days. She said that she feels so much energy but she couldn't sleep . . . she kept telling me, don't ask too many questions." Angeles said, "Her behavior was . . . I don't know how she would react whenever I would ask her something. She also said that she hadn't ate [sic] in days and that she felt like her throat was going to close." Angeles's disposition "was reason to believe . . . for neglectful supervision."

Angeles offered Mother a drug test, and Mother stated she would only consent to taking a hair follicle test, which the Department's supervisor rejected because the Department required a urine drug test, which tests for synthetic marijuana. Angeles was unable to acquire a urine sample from Mother. Angeles testified that Mother informed her that she had been "diagnosed with posttraumatic stress disorder, anxiety, bipolar disorder, and postpartum depression from her baby." Mother "said that she went to go to her . . . OB/GYN, and that she was trying to let him know . . . about her diagnosis, and she said that she tried . . . and that she couldn't be seen because they weren't accepting walk-ins." Mother did not reveal that she was taking any medications and only stated she was taking a "dietary supplement that she showed" Angeles.

16

Angeles said, "I observed [Mathew] and [John] at the daycare. They were good. They didn't have any marks or bruises. The only thing that was my concern was the scratching. I did observe head lice, but that was the only thing." Angeles continued, "And then I observed [Linda] at her school and she was also . . . clean. She had no marks or bruises. And then I observed the baby [Albert] with [Mother], at her house, and he was also good." Angeles learned that the following day, the Department removed the children from Mother after an incident on the side of the road.

### 2. Velasquez

Velasquez, a Department investigator, testified that she "received a report for [Mother] back on February 18[,]" 2023 of "neglectful supervision." Velasquez went to Mother's residence to make contact; however, Mother was not there and "[h]er whereabouts were unknown." Velasquez observed that "[t]he home was completely dark. [She] did arrive with law enforcement" and was able to "make contact with [D.A.]."

D.A. allowed Velasquez to inspect the home; however, Mother and the children who were in her custody, including Linda, were not there. Velasquez was unable to contact the children that day; however, the "following morning," she was "informed [officers] had found [Mother and the children walking] on the side of the road, so [they] made contact with [M]other," and Velasquez "observed [M]other with the children and a stroller" "[o]n the side of the road." Velasquez stated, "I did try to talk to [M]other; she told me she was heading to [D.A.'s] house."

The Department asked Velasquez to describe how the children appeared. Velasquez replied, "Baby [Albert], he was sweaty, he was soiled in his diaper. [John], he was wearing clothes that wasn't his, also sweaty. [Linda] was wearing her pajamas; they

17

were long sleeve, so she was also kind of sweaty. I think the children said that they hadn't eaten." On cross-examination by Mother's trial counsel, when asked how far away from D.A.'s house Mother and the children were, Velasquez said, "It was far to walk to."

Velasquez believed that Mother was "acting unusual," and Mother told her she left D.A.'s house "because she felt unsafe." Velasquez asked why she felt unsafe. Mother replied, "because the cartel was after her." Velasquez stated she became concerned because when she approached Mother and the children, Linda "immediately ran behind" Velasquez. Velasquez informed Mother that the Department was removing the children from her custody and took the children to the hospital; the children were mostly fine except that "[t]he baby had a really bad diaper rash . . . [a]nd one of [the children] had a bite mark."

### 3. Mother

Mother testified that all her children were under the Department's care "[f]or neglectful supervision . . . because [she] was walking in the street . . . on the side of the street with [her] kids." Mother stated that on the previous evening, she had left her sister's house in San Juan "to go rent a room for [herself] and [her] kids at the Pen-Ann," a hotel in Pharr. Mother testified she asked Linda whether she would like to walk back to D.A.'s house in San Juan or take the bus, and Linda wanted to walk. The Department asked, "So you were going to have your children walk to another city?" Mother replied, "Not walk . . . I use the bus"; however, Linda wanted to walk, and "[i]t wasn't that hot that morning." The Department asked, "So . . . you left it up to a 7-year-old child to make the decision whether to walk or take the bus?" Mother said, "It's not up to her. It was so we can walk as family to enjoy our breeze and to have a little conversation with each other."

18

When asked why she left D.A.'s house, Mother replied,

> Because [D.A.] and my mom and her boyfriend were arguing for money and my kids don't need to be hearing things like that and they don't need to be hearing people arguing for money. I only had $50.00 in my pocket, sir, and I gave $25.00 to [D.A.] since she's the owner of the house. And I told her, those $25.00 are for you. You do whatever you need with those $25.00 but the other $25.00 are for me and my kids.
>
> When I told her that the other $25.00 were for me and my kids her and my mom got angry. It started getting out of control [and they] started arguing with each other. And [they] started telling me, ["]you're going to give me those 50 bucks; if not you can get out of here with your kids.["]
>
> Like I said, my kids don't need to be hearing things like that. They don't need to be hearing people argue for money. So I got my $50.00 and that's when I left. That's why I went to rent at the Pen-Ann. My kids had a good day. They didn't need to be hearing people arguing for money.
>
> That's why I left. That's why we spent the night at the Pen-Ann. And then early in the morning, we took a shower there at the Pen-Ann, walked [to D.A.'s] house so I can make them breakfast, change their outfits and get them groomed again.

Mother testified that she had been complying with the ordered drug tests, and the last test was "[p]robably like three weeks" prior to her testimony. Mother said, "I've been texting [Vasquez], I've been calling [Vasquez], I've been going to the department. Whenever you-all need me to go take a drug test, I'll be more than glad to go take a drug test." Mother said that she did not currently have any mental diagnoses as she was "waiting for [a therapist] to do [her] examinations." Mother said, "Right now, I am not taking any medication. I do take medication for my anxiety and for my depression, but I ran out of them." Mother "hoped" to go to a doctor in Mission for "a physical check." Mother stated she had been without her medication for approximately three or four "days already." The Department asked Mother to identify the medications. Mother replied, "They have big words to them . . . I just know that they're for my anxiety and my depression. But I have

19

them in a little notebook but I didn't bring them with me . . . . I don't want to be carrying them with me because I'm going to get in trouble for it." Mother testified that she had been consistently taking her medication "after [she] turned [herself] in to the [hospital] and [the doctor] gave [her] those medications . . . [l]ike a month ago." Mother testified that when she does not take the medications, she "is not the same" as she does not eat and sleep "the same." Mother acknowledged that while she had custody of the children, she had been without her medications for approximately one month.

Mother testified that she believed that her mother's boyfriend, T.O., had been following and stalking her. The Department asked, "Is he a part of [a] gang or cartel?" Mother responded, "I'm not sure. Not sure anymore. But don't want no contact with them anymore. I just want to be good with my kids." The Department asked, "And was he stalking you?" Mother said, "Maybe because . . . he wanted money that my mom was sending him." Mother acknowledged that she had posted a photo on Facebook of herself with a knife. Mother explained this was

> [b]ecause . . . I was angry and [my mom and T.O.] were telling me that I was acting all that because I was getting my daughter back. And they were saying that the more happier I get with my daughter and the more that I have fun with my kids that the more they were going to pressure me to take them away.

Mother testified that when the Department removed her children, she did not sleep for one week, which is the longest she has gone without sleep. Mother claimed that she was "good" when she had custody of the children. Mother admitted that when the children were in her care, she took her prescription medication "and the medication that [her] mom gave" her. When asked if the medication her mother gave her was prescription, Mother replied, "It was for her. She said it was for my nervous system." Mother testified that the

20

medication was "[t]he Bluebonnet," which are "vitamins that her mom had gotten for her. So since her mom got them for her, so she was trying to pass them to me." The Department asked, "So you mixed those vitamins or whatever they were with the medication that [your doctor] had given you?" Mother replied, "Yes, ma'am." The Department asked, "Is that when you started to feel particularly bad?" Mother said, "Paranoid . . . Yes, Ma'am." Mother denied that she had used drugs in 2023, and she pointed out that she had taken a hair follicle test that was negative.

The Department asked Mother if she believed she had been provided with "chances to be reunited with [her] children." Mother replied, "Yes, sir." When asked, "What happened throughout those chances," Mother responded, "It was just a slip. I took medications and mixed them when I wasn't supposed to." Mother stated she planned to resolve her issues with her medications by keeping "up with [her] doctor's appointment[s] and [her] mental health for . . . [her] and [her] kids." Mother testified that she had been arrested on April 19, 2023, "[f]or disorderly conduct." When asked if it related to a car accident, Mother said, "Sort of." Mother agreed that her arrest had "to do with a warrant for [her] arrest that [she] had for not appearing in court." Mother stated that the failure to appear "was under investigation" and explained she missed the date "[b]ecause [she] got arrested for disorderly conduct at McDonald's." Mother said, "It was an accident. I'm sorry." Mother's trial counsel explained:

> Just for the Court's information, she had a previous charge of hitting an unattended vehicle . . . it was, like, a year or more ago, and I guess she didn't appear to a court date. So, when this happened at McDonald's, it was like she had a warrant for not appearing. But that incident happened over a year ago. So . . . the unattended vehicle thing had nothing to do with the April 19[] incident as far as it occurring at the time.

21

### 4.     Loredo

Loredo testified that at the beginning of the case, her recommendation for Linda was parental termination and adoption, and her position had not changed. Loredo explained,

> I think . . . at the beginning when I had said termination, you had asked several questions as to why there had been no communication with [Mother]. And then there was an opportunity of [Mother] to . . . engage with me and also see visitation with [Linda]. There were visitations. I saw, you know, the interactions. And at the beginning, they were good. I did see [Linda] have a good relationship with [Mother], but then after February, things were not going as well. And I have spoken to [Linda], I have . . . asked her, and [Linda] . . . does not want to speak to her mom, see her mom.

When asked if she thought it would be dangerous for Linda to be returned to Mother, Loredo replied, "From what I saw . . . back in February, yes." Loredo explained:

> When [Linda] was visiting with [Mother], I could never speak to [Linda] by herself. There was always [Mother] coming to see where the child was. And . . . being alone with [Linda] was not really that possible because we were at a hotel room. And then I would try to take her out, but . . . there wasn't really space for me to be there. So, I would be out in the main lobby and I want to say that . . . maybe five or ten minutes later, [Mother] would come out to see where we were. So, I didn't really have that interaction with [Linda], to see how were things in reality, you know, going at home.

Loredo testified that Linda had been allowed to live with Mother at the end of December 2022, and in January and February 2023. However, there was the "mid-February incident with the mental health," and Loredo went to the home when that occurred. This incident now formed the basis of Loredo's opinion in favor of terminating parental rights.

Loredo explained that prior to living with Mother, Linda stated she missed Mother and wanted to live with her; however, now, Linda "says no." Loredo said, "I say, why? And

22

she says she's scared, she doesn't want to." Loredo reiterated that "what [she] saw there that day [February 19, 2023], wasn't safe." Linda testified that ever since that date, Linda no longer wanted to visit Mother, and visitation had not occurred. Loredo said, "I asked her, do you want to see your mom . . . do you want to talk to her? And she says no." Loredo stated that Linda is secure in her current placement and that termination of Mother's parental rights was in Linda's best interest.

## F.    Associate Judge's Ruling

On June 30, 2023, the associate judge orally terminated Mother's parental rights pursuant to Texas Family Code § 161.001(b)(1)(D), (E), and (O). The trial court terminated Father's parental rights pursuant to Texas Family Code § 161.001(b)(1)(E), and (Q). The court also found that termination of both parents' rights was in Linda's best interest. *See id.* § 161.001(b)(2). Father and Mother each filed for a de novo appeal to the referring district court.

## G.    De Novo Hearing

The district court held a de novo hearing on October 22, 2024. Mother testified that during the pendency of this cause, Linda had been placed back in her custody; however, subsequently, an incident occurred which caused the Department to remove all children from her custody. Mother stated that, in a separate cause, she completed the services required for reunification with her sons, and they were now residing with her. Mother was granted permanent custody of her three sons two months prior to her testimony on August 18, 2024. The Department agreed to Mother having permanent custody of those children. The three children had been in her custody for approximately eight months and were doing well. Mother had been employed at Jack in the Box for "more than a year." Mother

23

testified that she had been "keeping up" with her mental health needs and had a stable home for Linda.

Aaron Espinosa, a Department caseworker, testified that Linda now lives with her maternal aunt, L.A., in Kerrville and is "doing well." Espinosa said, "She is adjusting to the placement. She's already made friends at school. She's gotten along with . . . [L.A.'s] relative there. So she's doing really well." When asked if Linda wanted any contact with Mother, Espinosa replied, "No" because "she feels a lot of resentment towards [Mother]. She's grown up in the system. She's never been cared for by [Mother]. And her time with [Mother] wasn't pleasant." The Department was not recommending visitation "[b]ecause it's [Linda's] position that she doesn't want . . . any visits with Mother." Espinosa stated, "[Linda has not] had a relationship with [Father]. He's been in and out of jail basically her whole life." Espinosa testified that Father would be incarcerated until 2026.

Espinosa believed that it was in Linda's best interest to refrain from any contact with Mother. Espinosa explained that Linda "continues to refuse to visit . . . or have any contact with" Mother and that Linda "has a lot of behavior issues. She's been diagnosed with disruptive behavior, attachment disorder, ADHD." Therefore, "she requires a lot of attention" and "when she was previously placed with [Mother], she wasn't able to provide her with" that care. Espinosa said, "[Mother] did end up having a mental breakdown during that time that she took care of [Linda] because, like I mentioned, she has a lot of special needs. So we believe right now . . . [L.A. is] able to provide her a long-term placement." Espinosa testified that the Department "fear[ed] that if [Linda had] contact with Mother, that's going to disrupt her progress that she's made with [L.A.]."

Espinosa was asked why it would be an issue for Mother to go to therapy with

24

Linda. Espinosa responded, "One, [Linda] has refused to have any contact. And two, [Mother] has previously stated that, you know, she can't handle her because of her behavior." The Department's position was that Linda was "doing well with [L.A.], and . . . if [Linda] ha[d] contact with [Mother], that might disrupt her progress." The Department's goal is that L.A. adopt Linda. Espinosa believed that it would be detrimental to Linda's mental health if Linda was ordered to visit with Mother.

The district court signed the termination order on December 4, 2024. This appeal followed.

## II.    STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts or omissions prohibited by § 161.001(b)(1) of the Texas Family Code. TEX. FAM. CODE ANN. § 161.001(b)(1); *In re J.L.*, 163 S.W.3d at 84. The trial court must also find by clear and convincing evidence that termination of parental rights is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *see id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

25

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

When a party challenges a trial court's findings of fact on legal or factual sufficiency grounds, we review the trial court's findings under the same sufficiency of the evidence standards used when determining if sufficient evidence exists to support jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re D.S.P.*, 210 S.W.3d at 778. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under a factual sufficiency standard, we consider whether the

> disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

Subsection 161.001(b)(1)(D) of the Texas Family Code allows termination when the evidence proves by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Pursuant to § 161.001(b)(1)(E), termination is proper if the parent has engaged in conduct or knowingly placed the child with persons who engage in conduct which endangers the child's physical or emotional well-being. *Id.* § 161.001(b)(1)(E). Endanger is defined as exposing to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "The child need not actually suffer injury, however, endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.*

"Subsection (D) . . . focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (applying TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). "[I]nappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis" are "inherently part of the 'conditions and surroundings'" of

---

[8] Only one statutory ground finding is necessary to support a judgment of termination, but in *In re N.G.*, "the Texas Supreme Court held that due process demands that we review the evidence supporting findings under [g]rounds D and E when they are challenged on appeal because termination of parental rights under these [g]rounds 'may have implications for . . . parental rights to other children.'" *In re L.W.*, 609 S.W.3d 189, 195–96 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam)). Therefore, we will address both grounds in our analysis as applicable. *See id.*

the child and subsection (D) is "manifestly designed to protect children against just such an environment." *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (E), on the other hand, focuses on the parent's involvement in a conscious course of conduct including not only acts but also omissions or failures to act that endanger the child. *In re E.G.*, 643 S.W.3d 236, 252 (Tex. App.—Amarillo 2022, no pet.). The specific danger to the child's well-being may be inferred from the parent's conduct and need not be established as an "independent proposition." *Id.* The evidence pertaining to § 161.001(b)(1)(D) and (E) are interrelated, and we may therefore conduct a consolidated review. *In re J.W.*, 645 S.W.3d at 749.

## IV. MOTHER

By her first through third issues, Mother contends that the evidence is legally and factually insufficient to support the grounds for termination or that termination is in Linda's best interest.

## A. Statutory Grounds

We first address Mother's argument that the predicate finding under (O) is inapplicable because it "unambiguously requires removal from the parent" and Linda was removed from Angie, who had permanent custody of Linda, not Mother. Mother testified that the Department had removed Linda in 2017 from her care and custody "because of me" and "[b]ecause I didn't have her in a good home." Mother admitted that the Department had removed Linda in 2017 because she had been using synthetic marijuana and Xanax and that Angie was then given custody of Linda because of that removal. Thus, there is evidence in the record that Linda had been removed the first time from Mother due to abuse or neglect. *See id.* § 161.001(b)(1)(O). Linda then lived with Angie

28

for four years because Mother did not seek custody of Linda.

Mother further argues that there is no evidence or factually insufficient evidence that she either allowed Linda to remain in surroundings which endanger her well-being or engaged in conduct that endangered Linda's physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). Mother points to evidence that by the time of the de novo hearing held by the district court, she had custody of her sons.

Once Mother did get custody of Linda during the pendency of this case, the Department removed Linda once more because Mother had taken Linda from the home where they lived and was found walking on the side of the road with her children who were hungry and scared. The Department had received an allegation that Mother was unstable and possibly using drugs. The Department determined that there was reason to believe that there was "neglectful supervision."

Use of illegal drugs by a parent supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well-being of a child."). "'And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he knows he is at risk of losing his children,' such evidence has been found legally sufficient to support a finding of

29

endangerment under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (quoting *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.)). "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *In re M.R.J.M.*, 280 S.W.3d at 502.

Mother admitted that when she was found walking on the side of the road with the children, she had mixed her prescription medications with some type of "vitamins" her mother had given her, which caused her to feel "paranoid."[9] There is evidence that Mother had missed many of the drug tests during the pendency of this case and had not completed her drug counseling. Mother admitted she used synthetic marijuana and Xanax in the past, admitted to mixing her prescription medications with other substances, and refused to take a urine test, which tests for synthetic marijuana, the day before she was found walking on the side of the road with her children while behaving erratically. As the factfinder, the trial court may have reasonably inferred from her refusal to complete drug counseling and submit to drug tests that Mother was using drugs. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding that a

---

[9] Mother claims in her brief that the substance she took was a "perfectly legal herbal supplement from [B]luebonnet" and that she was unaware that it "would interact with her medication and make her ill." However, as the fact finder, the trial court was free to disbelieve that the substance was an herbal supplement and could have reasonably inferred that Mother had taken an illegal substance with her medications based on evidence of Mother's past drug use and refusal to take a urine test that can detect synthetic marijuana. *See In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *see also In re B.C.S.*, 479 S.W.3d 918, 925 (Tex. App.—El Paso 2015, no pet.) ("We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so."); *see also In re E.P.*, No. 10-22-00086-CV, 2022 WL 2977479, at *2 (Tex. App.—Waco July 27, 2022, no pet.) (mem. op.) ("Further, it is reasonable for the factfinder to infer from a parent's refusal to take a drug test that the parent was using drugs during the proceedings.").

parent's failure to submit to a court-ordered drug test leads to a reasonable inference that the parent was avoiding the testing to conceal continued drug use); *In re E.M.*, 494 S.W.3d at 222; *see also In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) (recognizing that it was reasonable for fact finder to infer "that the father was still using methamphetamine, or some other illegal drug, based on his failure to take court-ordered drug tests").

There is evidence that Mother has been diagnosed with a multitude of mental health issues which were often left untreated. Mother acknowledged that she had been without her medications for approximately one month when Mother had custody of the children and that she "is not the same," "does not sleep," and does not "eat the same" when she fails to take her prescription medications.[10] Mother also testified that the cartel was after her, that she believes T.O. is stalking her, and that she thereafter posted an image of herself on her social media holding a knife as a means of threatening anyone who meant her harm. Mother believes that her mother and T.O. are trying to prevent her from gaining custody of Linda because they say Mother "was acting all that because [she] was getting" Linda back. Despite Mother's suspicions of her mother, she still took the "vitamins" her mother allegedly gave her. The trial court may have reasonably found that Mother kept Linda in surroundings that endangered her emotional and physical well-being because despite her mental health issues, Mother used illicit drugs with her prescribed

---

[10] In her brief, Mother claims that she was "compliant with medications while [Linda] was in her care, and her brief lapse in medication occurred after the removal." However, during the June 2, 2023 trial, the Department asked, "And during that month that you weren't on your medication, were the children under your care?" Mother replied, "Yes." The trial court heard evidence that Mother told Angeles that she could not sleep and had not slept or eaten in days. This occurred the day before Mother was walking on the side of the road with her children.

medications and did not consistently take her prescribed medications, which caused her to be paranoid and behave erratically. *See In re J.S.*, 675 S.W.3d at 128 (explaining that although "paragraph (D) concerns endangerment due to the child's environment, parental conduct is relevant" as "parent's drug use, violence, or other abuse may make the child's environment endangering to the child"); *In re E.M.*, 494 S.W.3d at 221–22 ("Section D permits termination based upon only a single act or omission.").

"Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being." *In re M.R.J.M.*, 280 S.W.3d at 503. Here, there is evidence that Mother had not visited Linda when visitation had been allowed. Moreover, during the pendency of the case, Mother was not available when contacted by the Department and would not respond to the Department when contacted to discuss the case. The trial court could have reasonably found that Mother endangered Linda's physical and emotional well-being by failing to complete her services regarding mental health or otherwise address the inadequacies that caused Linda's removal from Mother. *See In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("This evidence of the parents' failure to comply with services to improve their mental health is a factor that the trial court could have considered in finding that the parents engaged in a course of conduct that endangered the physical and emotional well-being of the Children."); *see also In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *8 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, pet. denied) (mem. op.) ("[A] parent's voluntary failure to engage in or complete services can constitute evidence of child endangerment, particularly to the extent the parent's failure to do so indicates that past endangering conduct remains unaddressed and is likely to persist in the future.").

When Linda was finally returned to her, Mother mixed her prescription medications with an unknown substance, had a mental breakdown, and caused Linda to fear Mother. *See J.S. v. Tex. Dep't of Fam. & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards."). Additionally, although Mother testified that she had "turned [herself] into [the hospital]" for mental health issues after the children were removed, she still failed to take her medications consistently. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (explaining that a parent's untreated mental health issues can be considered as endangering a child's well-being). Mother had also been arrested for disorderly conduct, failure to appear, and for an incident involving a car accident during the pendency of the case. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (concluding that a parent's continuous criminal "behavior evinces a course of conduct that a factfinder reasonably could conclude endangers [the children's] well-being"); *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (concluding that past criminal conduct and behavior qualified as a voluntary, deliberate, and conscious course of conduct endangering the child's emotional well-being).

Based on the foregoing and giving due deference to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that Mother engaged in conduct or knowingly allowed Linda to remain in conditions or surroundings which endangered Linda's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see also In re E.M.*, No. 09-21-00317-CV, 2022 WL 1037756, at *8 (Tex. App.—Beaumont Apr. 7, 2022, no pet.) (mem. op.) (setting out that the father's

"ongoing drug use following the children's removal, his arrests, his decision to leave the children with an inappropriate caregiver, and his violent outbursts supported the trial court's" termination pursuant to § 161.001(1)(D) and (E)). The evidence was legally and factually sufficient to support these statutory grounds for termination. *See In re J.S.*, 675 S.W.3d at 128; *In re S.D.*, 980 S.W.2d at 763; *see also In re S.R.*, 452 S.W.3d at 365; *In re J.I.T.P.*, 99 S.W.3d at 845 (explaining that a parent's mental health issues can be considered as endangering a child's well-being). We overrule Mother's first through third issues.

**B.    Best Interest**

By her fourth issue, Mother challenges the legal and factual sufficiency of the evidence supporting a best interest finding.

**1.    Applicable Law**

In *Holley v. Adams*, the Texas Supreme Court provided the following nonexclusive list of factors for the trier of fact in a termination case to use in determining the best interest of the child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976).

## 2. Analysis

Linda has indicated that she does not want to be returned to Mother's custody because she is afraid after Mother had a mental breakdown. Linda requires a lot of stability and medical care due to her own mental issues. There is evidence that during the pendency of the case, Mother did not tend to her own mental health needs, and when she finally had custody of Linda, Mother mixed her medications with an unknown substance, failed to take her prescribed medications, and behaved so erratically, Linda became afraid of her. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (providing that, the trial court may consider the parent's inability to provide adequate care, lack of parenting skills, and poor judgment in best interest analysis). Evidence that Mother used illegal drugs, failed to comply with drug testing, and refused a urine drug test at the time she admitted to using an unknown substance with her medications leads to a reasonable inference that returning Linda to Mother is not in Linda's best interest. *See Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that the trial court may consider a parent's history of substance abuse in best-interest determination); *In re A.M.O.*, No. 04-17-00798-CV, 2018 WL 2222207, at *2 (Tex. App.—San Antonio, May 16, 2018, no pet.) (mem. op) ("A parent's illegal drug use supports a finding that termination of the parent-child relationship is in the best interest of the child."); *In re K.N.*, No. 02-13-00062-CV, 2013 WL 3325104, at *6 (Tex. App.—Fort Worth June 27, 2013, no pet.) (mem. op.) (considering mother's drug use during pregnancy in best-interest determination). This is because "drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re A.L.S.*, 660 S.W.3d 257, 275–76 (Tex. App.—San Antonio 2022, pet. denied). The

35

trial court could properly give "great weight" to evidence of Mother's drug-related conduct. *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (internal quotation marks omitted); *see also In re K.N.*, 2013 WL 3325104, at *6; *In re A.M.O.*, 2018 WL 2222207, at *2 ("A parent's illegal drug use supports a finding that termination of the parent-child relationship is in the best interest of the child."). The trial court could have disbelieved Mother's excuse for leaving her sister's home because there is evidence that on a previous visit, the Department informed Mother that it was investigating allegations of neglect. And when the Department tried to locate Mother the next day, she had absconded with the children while in an admittedly unstable mental state. Mother's behavior evinces a course of conduct that the trial court could have reasonably concluded endangered Linda's well-being. *See In re L.G.R.,* 498 S.W.3d at 204–05.

"A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future." *In re J.M.T.*, 519 S.W.3d at 270. Here, Mother did not comply with her service plan in various respects, most importantly by not attending counseling, drug counseling, or visiting Linda. Mother failed to keep in touch with the Department, and when the Department attempted to contact her, Mother was unavailable and did not assist them. Loredo "tried to communicate many times with [Mother]" using various methods "every month . . . since" the case had been assigned to her. Because she was unsuccessful, Loredo had "not seen any kind of relationship" or interaction between Mother and Linda. From the evidence presented, the trial court could have reasonably concluded that Mother's non-

36

compliance with the Department, failure to visit with Linda, and failure to cooperate in drug testing showed a lack of interest in retaining her parental rights. *See id.*; *In re C.J.P.*, No. 04-24-00458-CV, 2024 WL 5195302, at *12 (Tex. App.—San Antonio Dec. 23, 2024, no pet.) (mem. op.); *In re O.L.W.*, No. 04-24-00208-CV, 2024 WL 3588395, at *4 (Tex. App.—San Antonio July 31, 2024, pet. denied) (mem. op.) ("Like illegal drug use, failure to submit to drug testing—through which the trial court could infer illegal drug abuse—is relevant to multiple best-interest considerations."). This evidence supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (providing that the same evidence of acts or omissions used to establish grounds for termination under § 161.001(1) may be probative in determining the best interests of the child); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 620 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting that the parent lacked parental abilities and showed no interest in caring for the children, which supported a finding that termination was in the children's best interest); *In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.) (setting out that parents need to maintain stability for the children); *see also In re S.R.*, 452 S.W.3d at 362 ("Failure to maintain stability endangers the child's physical and emotional well-being.").

It is a compelling state interest to establish a stable and permanent home for Linda, and the Department has shown that Mother has been unable to do so. *See In re S.R.*, 452 S.W.3d at 367 ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs."); *In re C.E.K.*, 214 S.W.3d at 498; *Doyle v. Tex. Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (concluding that termination was in the child's

37

best interest when there was evidence that the parent failed to provide a stable home and provide for a child's needs). Linda is satisfied in her placement and has indicated that she would not like to be returned to Mother. There is evidence that L.A. intends to adopt Linda, and that "it would be detrimental to Linda's mental health if Linda was ordered to visit with Mother." *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.) ("[W]e . . . presume that prompt and permanent placement of the child in a safe environment is in the child's best interest."). Moreover, Mother has not established a stable home environment for Linda as she has moved several times during the pendency of the case from one hotel to another. And, when she lived with her sister, she left to stay in a hotel due to what she described as inappropriate arguing among herself, her sister, mother, and T.O.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that that termination of Mother's parental rights is in Linda's best interest. *See In re J.L.*, 163 S.W.3d at 85; *In re D.S.P.*, 210 S.W.3d at 778. Moreover, in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in Linda's best interest. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination is in Linda's best interest. We overrule Mother's fourth issue.

## C.     Constitutional Rights

By her last issue, Mother generally contends that the district court violated Mother's constitutional rights to due process because it "issued a bare affirmation of the [associate judge]'s ruling without analysis, despite hearing compelling evidence of stability from"

Mother. Next, Mother claims her constitutional rights were violated because "[t]he evidence presented was speculative and conclusory—no therapist or substantive testimony linked [Mother's] conduct to harm," and "[t]he Department failed to make reasonable reunification efforts under [Texas Family Code] §[§ ]262.201(f), 263.306, and 263.307." Finally, Mother argues she "was forced to find services independently and received no assistance for transportation or visitation."

Mother did not object before the associate judge or district judge on the basis that her due process rights had been violated. Therefore, these assertions are not preserved. *See* TEX. R. APP. P. 33.1(a); *In re L.M.I.*, 119 S.W.3d 707, 710 (Tex. 2003) (observing that even constitutional complaints can be waived by failure to object at trial, and explaining that although the parent's petition for review argued that the termination order "violated [his] due process rights," the parent had not preserved this issue in the trial court as his "answer and counterpetition to the termination proceedings cite no constitutional authority, and he did not raise the issue in any post-judgment motion"). We overrule Mother's fifth issue.[11]

---

[11] By what we construe as a first sub-issue to her fifth issue, Mother asserts that the associate judge "made conclusory findings and gave no analysis as to what the [it] had based its findings" on and the district judge's "verdict after hearing additional alleviating and compelling evidence was simply that [it] believed the [associate judge] was correct, and it affirmed." This issue is inadequately briefed as Mother provides no legal analysis with appropriate authority supporting a conclusion that either judge's actions constituted reversible error. *See* TEX. R. APP. P. 38.1(i). Next, by a second sub-issue to her fifth issue, Mother asserts the termination was based on "[m]ere speculation or evidence that is merely conclusory" and therefore "will not survive a legal sufficiency analysis." We reject this assertion as we have set out the evidence in great detail that supports the trial court's termination of Mother's parental rights. Finally, by a third sub-issue to her fifth issue, Mother argues that the Department failed to provide evidence that it made "reasonable efforts to reunify the family before termination." *See* TEX. FAM. CODE ANN. § 161.001(f) (providing generally that a court may not order termination unless it finds by clear and convincing evidence that "the [D]epartment made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent"). This argument is without merit as Linda was returned to Mother during the pendency of the case and then had to be removed a second time as explained in detail above. We overrule these three sub-issues.

## V.  FATHER

### A.  *Anders* Brief

Father's court-appointed counsel has filed a brief stating that he has diligently reviewed the entire record but has concluded that there are no "arguable grounds" to advance an appeal. *See Anders v. California*, 386 U.S. 738, 744 (1967); *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 56 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) ("[W]hen appointed counsel represents an indigent client in a parental termination appeal and concludes that there are no non-frivolous issues for appeal, counsel may file an *Anders*-type brief."). Counsel's brief meets the requirements of *Anders* as it presents a professional evaluation demonstrating why there are no arguable grounds to advance on appeal. *See In re Schulman*, 252 S.W.3d 403, 406 n.9 (Tex. Crim. App. 2008) (orig. proceeding) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities.").

Counsel has informed this Court in writing that he: (1) notified Father that he has filed an *Anders* brief; (2) provided Father with a copy of the *Anders* brief; and (3) informed Father of his right to file a pro se response and to review the record prior to filing that response, and (4) provided Father with a form motion for pro se access to the appellate record. *See Anders*, 386 U.S. at 744. An adequate amount of time has passed, and Father has not filed a pro se response.

### B.  Independent Review

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the case is wholly frivolous. *Penson v. Ohio*, 488 U.S.

75, 80 (1988); *see also In re G.M.*, No. 13-08-00569-CV, 2009 WL 2547493, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 20, 2009, no pet.) (mem. op.). We have reviewed the entire record and counsel's brief, and we have found no reversible error with respect to Father. *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005) ("Due to the nature of *Anders* briefs, by indicating in the opinion that it considered the issues raised in the briefs and reviewed the record for reversible error but found none, the court of appeals met the requirements of Texas Rule of Appellate Procedure 47.1."). We have specifically reviewed the trial court's findings under part (E) of family code § 161.001(b)(1), and we have found no non-frivolous issues that could be raised on appeal with respect to those findings. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under [§] 161.001(b)(1)(D) or (E) of the Family Code").

## VI.    CONCLUSION

We affirm the trial court's judgment as to both parents.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
12th day of June, 2025.

41